IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| SARAH MARIE COBBLE, | ) | Case No. 3:24-cv-1128-JJH |
| | ) | |
| Plaintiff, | ) | JUDGE JEFFREY J. HELMICK |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | REUBEN J. SHEPERD |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

## I.    Introduction

Plaintiff, Sarah Marie Cobble ("Cobble"), seeks judicial review of the final decision of the Commissioner of Social Security, denying her application for disability insurance benefits ("DIB") under Title II of the Social Security Act. This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b). Upon review, I recommend that the Commissioner's final decision denying Cobble's application for DIB be affirmed.

## II.    Procedural History

Cobble filed for DIB on February 5, 2020, alleging a disability onset date of November 15, 2019. (Tr. 270-76). The claims were denied initially and on reconsideration. (Tr. 107-10, 123-26). She then requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. 127). Cobble, represented by counsel, and a vocational expert ("VE") testified before the ALJ on February 16 and July 6, 2021. (Tr. 31-95). On September 13, 2021, the ALJ issued a written

1

decision finding Cobble not disabled. (Tr. 15-35). The Appeals Council denied her request for review on August 3, 2022. (Tr. 1-3).

Cobble filed an appeal to this Court on September 28, 2022. (3:22-cv-01740-TMP, ECF Doc. 1). On February 21, 2023, the Commissioner filed a joint stipulation for remand pursuant to Sentence Four of Section 205 of the Social Security Act, 42 U.S.C. § 405(g). (3:22-cv-01740-TMP, ECF Doc. 11). On February 24, 2023, the Court granted the motion and ordered the matter remanded, with instruction for further consideration of Cobble's claim and to take any further action necessary to complete the administrative record, hold a new hearing, and issue a new decision; the case was then administratively closed. (3:22-cv-01740-TMP, ECF Doc. 12).

Pursuant to this Court's remand, the Appeals Council instructed the ALJ as follows:

Further consideration of the claimant's residual functional capacity (RFC) beginning in May of 2021 is necessary. The decision determined the claimant could perform medium work for the entire period at issue (*Id.* page 6). In making this determination, the decision did not fully consider whether the claimant's use of a walker beginning in May of 2021 would be medically necessary for 12 months (*Id.* pages 6-8). In May of 2021, the claimant contracted COVID, which necessitated the use of a walker due to shortness of breath (*See e.g.*, Exhibits 9F, 11F, 12F). At the hearing in July of 2021, the claimant testified she was still using a walker to ambulate (July 6, 2021 hearing recording at 11:29:49AM *et. seq.*). In reviewing the medical evidence, the decision referenced the claimant's use of an assistive device, but assumed it would not be needed "long-term" (Decision, pages 6-7). Without additional evidence, it is not clear that this statement accurately reflects the claimant's functioning. As such, further consideration of the claimant's RFC beginning in May of 2021 is necessary.

(Tr. 1066).

A new hearing before the ALJ was held on February 1, 2024. (Tr. 1010-35). The ALJ issued a written decision on April 30, 2024, again finding Cobble not disabled. (Tr. 986-1000). Cobble timely filed this action on July 3, 2024. (ECF Doc. 1).

### III.    Evidence

#### A.    Personal, Educational, and Vocational Evidence

Cobble was 44 years old on the date last insured, making her a younger individual according to Agency regulations. (*See* Tr. 998). She has at least a high school education. (*See id.*). In the past, she worked as a home attendant, DOT 354.377-014, SVP 3, medium exertion performed at very heavy; and as a general duty nurse, DOT 075.364-010, SVP 7, medium exertion; and nurse assistant, DOT 355.674-014, SVP 4, medium exertion. (Tr. 1013).

#### B.    Relevant Medical Evidence[1]

While the medical record contains records that predate the alleged onset date, I note that they generally establish Cobble's ongoing care and treatment for migraines. (*See e.g.*, Tr. 438, 48).

Medical records include appointments with Bryan Badik, M.D. from November 19, 2019, through June 26, 2023. (Tr. 484, 1976). Throughout that time, Cobble consistently presented with complaints of shortness of breath with minimal or no exertion. (Tr. 484, 596, 1575, 1976, 1993, 1996). While Dr. Badik's treatment notes indicate that he was unsure of the root cause of her shortness of breath, as any testing always came back negative, he suspected her anxiety and weight gain were contributing factors. (Tr. 596, 1993, 1996). However, Dr. Badik's personal impressions corroborated Cobble's complaints as he witnessed her becoming short of breath simply walking across his small exam room. (Tr. 1994). Dr. Badik's notes also reflect Cobble's

---

[1] Although Cobble provides a summary of medical evidence relating to her mental health impairments (see ECF Doc. 8, p. 5-6), she does not raise error with the ALJ's evaluation of these impairments. Instead, she raises error solely with the ALJ's evaluation of physical limitations. (*Id.* at pp. 13-18). I therefore limit my review of the medical evidence only to these issues and deem any argument as to her mental health impairments waived. *See McPherson v. Kelsey*, 125 F.3d 989 (6th Cir. 1997).

need for a wheeled walker, as she expressed an inability to lift a traditional walker while walking. (Tr. 596). A walker was needed due to leg pain, shortness of breath, and heart issues. (Tr. 1996). Throughout her treatment with Dr. Badik, Cobble's body mass index ranged from 53.85-61.11. (*See e.g.* Tr. 484, 1977, 1994, 1997).

Cobble called Dr. Badik's office on November 20, 2019, asking for a doctor's note to be excused from work due to shortness of breath. (Tr. 483). She reported that despite feeling better the day prior, she woke up with pressure in her chest and a pulse oximeter level of 83. (*Id.*). It had since elevated to the upper 90s but she was taking longer to recover. (*Id.*). People at work had commented how flush her face was after walking short distances despite using albuterol three times. (*Id.*). Dr. Badik wrote her a doctor's note and prescribed a steroid taper. (*Id.*). At a July 1, 2022 follow up with Dr. Badik, Cobble claimed she could not walk or stand for a significant period of time, could not push, pull, reach, grab, bend, could not lift more than five pounds, and had to frequently shift positions when sitting due to pain. (Tr. 1996). At her March 17, 2023 appointment, Cobble reported that she could not sit or stand for longer than three hours at a time, used a walker to get around, and required an aide to assist her with bathing. (Tr. 1575). Cobble also endorsed pain in her left knee which had crepitus and tenderness upon examination. (Tr. 1575-76). X-rays from this encounter demonstrated no acute osseous abnormality, tricompartmental degenerative changes most pronounced at the medial compartment, and chondrocalcinosis. (Tr. 1985). Dr. Badik referred her for a home health aide. (Tr. 1577). Dr. Badik also noted that Cobble experienced pain in her lower back, accompanied by a decreased range of motion. (Tr. 1977).

Cobble also frequently treated with Mohamed B. Elamin, M.D. On December 5, 2019, Cobble presented for an appointment with Dr. Elamin. (Tr. 478-79). Treatment notes indicate

that Cobble had been progressively complaining of dyspnea on exertion with self-tested oxygen levels as low as mid-80s. (Tr. 479). As a result, Cobble went to the emergency department ("ED") and was eventually admitted. (*Id.*). An echocardiogram showed preserved ejection fraction, mildly dilated right ventricle, mild tricuspid and mitral regurgitation, and the possibility of intracardiac shunt. (*Id.*). A transesophageal echocardiogram confirmed the presence of patent foramen ovale with minimal transseptal color-flow, septal aneurysm, and mildly dialed right ventricle. (*Id.*). Pulmonology suggested she submit for a sleep study but came to Dr. Elamin for a second opinion. (*Id.*). Upon examination, Dr. Elamin noted that Cobble was positive for shortness of breath, but negative for cough, hemoptysis, and wheezing. (Tr. 481). Her respiratory system was clear to auscultation bilaterally with no use of accessory muscles. (*Id.*). She had a BMI of 54.03. (*Id.*). Upon review, Dr. Elamin explained that Cobble's echocardiogram findings could be explained by pulmonary hypertension possibly secondary to sleep apnea and recommended that she obtain a sleep study and reevaluate after several months of CPAP therapy if warranted. (Tr. 482).

Cobble presented to the ED on December 15, 2019, with complaints of dizziness for a few weeks, dyspnea and edema since that morning, and ten-pound weight gain since last week. (Tr. 373). Records from this encounter indicate that Cobble was a fall risk. (Tr. 371). Upon examination, her heart rate was 86 bpm, respiratory rate of 18 breaths per minute, and an SpO2 of 96%. (Tr. 373). She reported ongoing issues of fibromyalgia, GERD, and anxiety. (Tr. 375). Cobble was negative for chest pain, palpitations, syncope, peripheral edema, back pain, neck pain, and joint pain. (Tr. 376). She was also negative for shortness of breath and anxiety. (*Id.*). However, it was also noted that she had diminished breath sounds. (Tr. 377). Imaging demonstrated clear lungs and pleural spaces and Cobble's chronic silhouette and pulmonary

5

vessels within normal limits – leading to no acute findings. (Tr. 389). Upon discharge, Cobble reported an improvement in her symptoms. (Tr. 379).

On December 16, 2019, Cobble called Dr. Elamin's office reporting that she had gone to the emergency department after feeling as though she was going to pass out and her heart rate escalating to the 140s with minimal activity. (Tr. 476). Dr. Elamin instructed Cobble to wear a Holter monitor for 48 hours. (*Id.*). After completing the Holter monitor, Cobble called complaining of lightheadedness with walking which was worse with exertion and requesting to be written out of work. (Tr. 477). She denied syncopal episodes but stated if she had not had her work cart or the wall to lean on, she would have fallen or passed out at work. (*Id.*). Dr. Elamin gave her a doctor's note for the remainder of the week but instructed anything further would need to go through her primary care physician. (*Id.*).

Cobble called Dr. Elamin's office again on January 20, 2020, to inform him that she had lost her job after she was seen on camera very weak and fatigued. (Tr. 477). She had also lost her home. (*Id.*). She requested that Dr. Elamin write a note stating she was medically unable to work because her primary care physician would not write a letter since she was claiming a cardiac condition. (*Id.*).  Dr. Elamin responded he had "no explanation for her shortness of breath and fatigue from a cardiac standpoint" and while he would love to help he did not "have firm grounds to issue a letter . . . ." (*Id.*). Her recent echocardiogram showed preserved ejection fraction with no significant findings that would explain her symptoms and a stress test done in April 2019 was low risk for cardiovascular events. (*Id.*). He reiterated his suggestion that she see a pulmonologist to evaluate her shortness of breath and for a sleep evaluation. (*Id.*).

On August 8, 2020, Cobble presented to the emergency department for a left sided stabbing migraine with photophobia and nausea that lasted for three days. (Tr. 497-98). She had

a complete resolution of her headache with Benadryl, Compazine, Toradol, and IV fluids. (Tr. 500).

Cobble was admitted to the ED on September 7, 2020, with sudden onset chest pain and shortness of breath. (Tr. 507). She rated the chest pain a 2/10 and claimed it was in the center of her chest and non-radiating. (*Id.*). Her respiratory rate was 19 with 94% oxygen saturation. (Tr. 509). An x-ray of her chest showed her lungs were without acute focal process, no effusion or pneumothorax, the cardio mediastinal silhouette was without acute process as well as the osseous structures. (Tr. 511). She also had a normal EKG with no acute changes. (*Id.*). A stress test demonstrated anterior wall perfusion defect consistent with mild ischemia, but her overall risk stratification was low (Tr. 537, 541). She was evaluated by cardiology with echocardiogram and cardiac catheterization after the positive stress test. (Tr. 517). A CT of her chest revealed no acute pulmonary embolism to the segmental level and no acute pleural parenchymal disease. (Tr. 521). She reported that she previously had a transesophageal echocardiogram that showed atrial septal defect with "'floppy heart.'" (Tr. 523). During her hospitalization, Cobble reported significant dyspnea on exertion if walking further than the bathroom, her oxygen levels dropped, and she started having tachycardia and palpitations. (Tr. 548). Cobble was discharged on September 11, 2020, with diagnoses of new onset shortness of breath, uncertain etiology, and history of desaturations. (Tr. 517). She was instructed to follow up with pulmonology and her primary care physician for further workup and management of symptoms. (*Id.*).

Cobble had a sleep apnea evaluation with Fateh Ahmed, M.D. on September 23, 2020. (Tr. 584-89). Upon evaluation, Cobble denied dyspnea, snoring, wheezing, and chest pain. (Tr. 584). She endorsed insomnia and shortness of breath on exertion. (*Id.*). Her heart rate was 98 beats per minute and her oxygen saturation was 96%. (*Id.*). Cobble reported that she was

7

diagnosed with sleep apnea roughly 10 years ago, but it was not severe enough to require treatment. (*Id.*). Dr. Ahmed assessed Cobble with shortness of breath, snoring, excessive daytime sleepiness, and sleep apnea. (Tr. 583). A CT scan revealed no acute pulmonary process, mild chronic lung changes, mild degenerative changes in the thoracic spine, and that her bones were otherwise unremarkable. (Tr. 587). At a December 14, 2020 follow up appointment, Cobble reported that she had not yet gotten her sleep study done. (Tr. 592). She also reported that her daytime fatigue and dyspnea had not changed. (*Id.*). Dr. Ahmed recommended weight loss and for Cobble to follow through with a sleep study. (Tr. 591).

On May 11, 2021, Cobble presented to the ED complaining of shortness of breath. (Tr. 616). She was admitted to the hospital after being diagnosed with COVID-19 and resulting pneumonia. (*Id.*, 630). Physical therapy was recommended upon discharge. (Tr. 713-14). A wheeled walker was prescribed due to her unsteady gait, upper body weakness, and inability to pick up an ambulation device. (Tr. 714, 729). The walker was necessary for her to complete activities of daily living such as eating, bathing, toileting, and personal care. (Tr. 729). Cobble was discharged on May 16, 2021. (Tr. 730). Dr. Badik provided prescriptions for a wheeled walker and a shower chair at a May 24, 2021 telehealth visit. (Tr. 823-30).

During an August 9, 2021 mental health appointment, Cobble reported that she was able to walk outside with the use of her walker. (Tr. 1302). By her October 4, 2021 appointment she was able to walk around her apartment without the use of a walker. (Tr. 1311).

On May 4, 2022, Cobble presented to the ED with a migraine that persisted for three days. (Tr. 1536). The pain was congruent with her typical migraines, however her regular medication was not working to treat the migraine. (*Id.*). She was given a "migraine cocktail" that alleviated her pain. (Tr. 1540). Cobble presented to the ED again on June 30, 2022, with a

migraine behind her right eye that persisted for three days. (Tr. 1512). Cobble explained she responded well to treatment from her last emergency department visit. (Tr. 1515). She was given Phenergan, Benadryl, and Toradol before being discharged. (*Id.*). Cobble presented to the ED again on January 14, 2023, with a migraine accompanied by dizziness. (Tr. 1476). Treatment with a migraine cocktail relieved her migraine and Antivert relieved dizziness. (Tr. 1478).

On March 2, 2023, Cobble presented to the ED with a two-day long migraine. (Tr. 1434). This migraine was accompanied by shortness of breath, exacerbated by activity. (*Id.*). Upon examination, her vitals were stable, her oxygen saturation was 92% on room air, and her shortness of breath was remarked as "very mild." (Tr. 1434, 1440). She was discharged the same day after symptoms resolved with medication. (Tr. 1438).

The medical record includes home healthcare notes from March 23 to May 18, 2023. (Tr. 1592-1733). Cobble needed home health assistance due to shortness of breath, weakness, pain, and difficulty ambulating. (Tr. 1592). She required a cane for ambulation but was only able to walk short distances. (*Id.*). Further, she was dyspneic with minimal exertion. (Tr. 1598). During her home healthcare, Cobble took short steps on both the right and left side with inconsistent rhythm, her head down, and an antalgic gate with the use of an assistive device. (Tr. 1654). Cobble was observed to have decreased safety and functional independence at home due to impairments in strength, balance, pain, and activity tolerance related to knee osteoarthritis and fibromyalgia. (*Id.*). She met an April 25, 2023, home health goal by demonstrating reduced restriction of mobility and improving her tolerance to therapeutic activities including independence with bed mobility, transfers, and functional activities. (Tr. 1701). However, she did not meet her goals of demonstrating a safe gait, improving musculoskeletal function, or enhancing balance functional activities. (*Id.*). On May 1, 2023, home health notes indicated that

9

Cobble needed the assistance of another person in order to leave her house even with the use of a walker. (Tr. 1702). Cobble's pain was a 4/10 and she had difficulty with both of her left and right knee. (Tr. 1704). She was more limited than normal in her mobility on May 11, 2023, due to a fibromyalgia flare up. (Tr. 1718). Cobble was discharged on May 18, 2023, after demonstrating improved functional mobility, demonstrated by her ability to ambulate 500 feet with a two wheeled walker. (Tr. 1733).

### C.     Medical Opinion Evidence

State agency medical reviewer, W. Scott Bolz, M.D. determined that there was insufficient evidence prior to Cobble's date last insured ("DLI") to evaluate her conditions. (Tr. 98). State agency psychological evaluator Jennifer Whatley, Ph.D. similarly found there was insufficient evidence pre-DLI to evaluate Cobble's mental limitations. (Tr. 99). Both determinations were affirmed on reconsideration. (Tr. 103-04).

Dr. Badik provided a medical source statement on June 26, 2023. (Tr. 1979-80). He opined that Cobble was extremely limited in pushing, pulling, bending, reaching, handling, and repetitive root movements, but she could frequently carry up to five pounds. (*Id.*). In his opinion, Cobble, in an eight-hour workday, could stand or walk for approximately one hour, but for only ten minutes uninterrupted. (*Id.*). Additionally, in an eight-hour workday she could sit for approximately two hours, but only an hour uninterrupted. (*Id.*). Dr. Badik also noted that Cobble used a walker because she gets short of breath with minimal activity and that her chronic back pain limited her mobility and activity. (Tr. 1980).

Cobble presented for a consultative evaluation with Donald Terrace, N.P., on October 10, 2023. (Tr. 1276-90). Cobble reported that her chief complaints were fibromyalgia, lower back pain, and unsteady gait. (Tr. 1276). Her issues originated with shortness of breath; however, she

reported that issue had resolved. (*Id.*). With her walker, NP Terrace noted Cobble's gait as
unsteady and without the walker, Cobble could take 10 steps "haltingly." (*Id.*). He determined
that her walker was medically necessary to ambulate. (Tr. 1275, 1285). Upon examination, her
knees were unsteady, and NP Terrace was unable to assess her supine as she could not get onto
the exam table. (*Id.*). However, her joints were marked stable and nontender with 6/18 trigger
points. (*Id.*). Her muscle strength was ranked a five throughout her body, indicating she contracts
against resistance, in addition to her having a normal range of motion. (Tr. 1279-83). NP Terrace
determined that Cobble had marked limitations in standing, sitting, walking, reaching, pushing,
pulling, and unprotected heights due to her unsteady gait and fibromyalgia pain. (Tr. 1278). He
determined that Cobble could occasionally lift up to ten pounds, but never more; never carry any
weight; sit four three hours, walk for one hour, and stand for ten minutes at one time; sit for six
hours, walk for one hour, and stand for two hours in an eight hour workday; occasionally reach,
handle, push, and bilaterally; continuously finger and feel bilaterally; continuously handle or
operate foot controls bilaterally; never climb stairs, ramps, ladders or scaffolds; never balance,
stoop, kneel, crouch, crawl; never have exposure to unprotected heights, moving mechanical
parts, operate a motor vehicle, humidity, wetness, dust, odors, fumes, pulmonary irritants,
extreme cold or heat, or vibrations; in a quiet or moderately noisy setting. (Tr. 1284-88).

### D.    Administrative Hearing Evidence

Cobble testified that she was 5′3″ tall and weighed 320 pounds. (Tr. 1012). At the time of
the hearing, she was widowed and lived alone. (*Id.*). Because she lived alone, she was
responsible for all of the household chores. (Tr. 1017). She had not worked any jobs since her
last hearing with an ALJ. (Tr. 1013). Cobble had a valid driver's license but did not own a

11

vehicle. (Tr. 1017). Further she could read, write, and sign her name as well as handle money and make change. (Tr. 1017).

Cobble testified that she was prevented from working due to her fibromyalgia and obesity. (Tr. 1013). She stated that she was in pain from the moment she woke up. (*Id.*). Her pain was a two or three at minimum. (*Id.*). However, on her "bad days" which she experienced at least twice a week, her pain was at a four or five. (*Id.*). She struggled with using the restroom and maintaining her hygiene due to the pain. (*Id.*). Basic housework, like vacuuming, took her days to complete. (Tr. 1014, 1020). After standing for 15 minutes she had to sit down, however she oftentimes had to lie down due to pain in her lower back, hips, and legs. (Tr. 1014). She often needed to lie down, for at least an hour, after sitting as well because it leads to pain in her back. (Tr. 1013, 1019). According to Cobble she laid down at least four times a day to relieve pain. (Tr. 1019). She could only sit for up to three hours at a time, depending on the chair. (Tr. 1017). Cobble also struggled with pain in her arms. (Tr. 1019).

She typically used a walker when out of her apartment due to being unsteady and getting short of breath while walking. (Tr. 1013). Previously, Cobble was doing physical therapy at home to cease using the walker. (*Id.*). Her physical therapist suggested that on her "good days" she not use her walker inside her apartment, however, she still needed to hold the walls to get around. (Tr. 1015, 1021). Her physical therapist recommended she have her walker when she is not at her apartment due to her balance and shortness of breath. (Tr. 1015). The shortness of breath was attributed to her obesity, but she has never been on any programs to help her lose weight. (*Id.*). She had been told that she is not a candidate for weight loss surgery due to her family history of anorexia. (*Id.*). Because of that history, losing weight quickly scared her. (*Id.*).

At the time of the hearing, Cobble was being treated for anxiety, depression, chronic PTSD, and fibromyalgia. (Tr. 1014). Her anxiety had gotten worse since her first hearing with an ALJ. (Tr. 1022). She stated that she gets anxious because she is "afraid of messing up." (Tr. 1022). She experienced anxiety attacks three or four times per week that last 15 minutes to an hour. (*Id.*).

Cobble struggled with migraines since she was "small" and they had progressively gotten worse with age. (Tr. 1016). Her migraines were triggered by lack of sleep, and different odors. (Tr. 1030-31). She experienced them two to three times a month and when she has a migraine she stays in bed, keeps the lights low, and tries to sleep it off. (Tr. 1016). A migraine can last up to three days. (*Id.*). She used to get a shot at the hospital to treat her migraines but can no longer do so after her husband passed away because they make her drowsy and she needs someone to drive her home afterwards. (*Id.*).

Next, the medical expert Dr. John Kwock testified regarding mobility and a person's use of a walker. (Tr. 1024-25). Asked his qualifications to testify as an expert about mobility and walker use, Dr. Kwock testified that after graduating medical school he finished post-graduate training in orthopedic surgery and had a private orthopedic practice for approximately 30 years. (Tr. 1025).

After reviewing Cobble's medical file and listening to her testimony, in Dr. Kwock's opinion, Cobble's only severe musculoskeletal impairment was osteoarthritis in the left knee. (Tr. 1026). This impairment would not meet or equal a listing. (*Id.*). Further, it was his opinion that there was no evidence in the record that supported a medical necessity for Cobble to use an assistive device. (*Id.*). However, it is "possible" that Cobble's obesity of 320 pounds on her 5′3″ frame could exacerbate pain in her knee. (Tr. 1027).

13

Finally, the VE testified. According to the VE, a hypothetical individual of Cobble's age, education, and relevant vocational background who could perform medium work except that they could only occasionally climb ramps and stairs; never climb ladders, ropes, and scaffolds; occasionally stoop, kneel, crouch, and crawl; occasionally work in conditions of humidity and wetness and conditions of extreme heat and cold or in conditions where there's concentrated dust, odors, fumes, and other pulmonary irritants, or where vibrations are present could perform Cobble's past work. (Tr. 1029). This hypothetical individual could also perform the jobs of hand packer, DOT 920.587-018, medium, SVP 2, with 84,000 jobs in the national economy; health care transport (by wheelchair), DOT 355.677-014, medium, SVP 2, with 139,000 jobs in the national economy; and laundry bagger, DOT 920.681-014, medium, SVP 2, with 76,000 jobs in the national economy. (Tr. 1030).

If the first hypothetical individual were further limited to occasionally using foot controls with their left lower extremity, the VE's testimony would be unchanged. (*Id.*). Nor would a limitation that they could frequently be exposed to concentrated smells of bleach. (Tr. 1031).

If the first hypothetical individual had all the same limitations, except that they were limited to light work, the VE testified that that hypothetical individual could not perform Cobble's past work. (*Id.*). However, this hypothetical individual could perform the jobs of food preparer, DOT 316.684-014, light, SVP 2, with 140,000 jobs in the national economy; cafeteria attendant, DOT 311.677-010, light, SVP 2, with 125,000 jobs in the national economy; and office helper, DOT 239.567-010, light, SVP 2, with 214,000 jobs in the national economy. (*Id.*).

If the first hypothetical individual had all the same limitations, except that they were limited to sedentary work, the VE testified that that hypothetical individual could not perform Cobble's past work. (*Id.*). However, this hypothetical individual could perform the jobs of order

clerk, DOT 209.567-014, sedentary, SVP 2, with 11,000 jobs in the national economy; charge account clerk, DOT 205.367-014, sedentary, SVP 2, with 13,800 jobs in the national economy; and final assembler, DOT 713.687-018, sedentary, SVP 2, with 21,000 jobs in the national economy. (Tr. 1031-32).

If a fourth hypothetical individual had all the same limitations as hypothetical one, except that they were limited to performing simple, routine, repetitive tasks but not at a production rate pace, meaning no assembly line work, this individual would not be able to perform Cobble's past work. (Tr. 1032). However, this hypothetical individual could perform all other work mentioned at the medium, light, and sedentary levels. (Tr. 1032-33). If the hypothetical individual needed a walker for being short of breath, that individual could still perform the sedentary jobs of order clerk, charge account clerk, and final assembly. (Tr. 1033).

Finally, the VE testified that being off task 20% of the workday would be work preclusive as well as missing two or more days per month. (*Id.*). The need to lie down during the workday outside of normal breaks would also be work preclusive. (*Id.*). When asked about standard breaks, time off task, and monthly absences in competitive employment, the VE testified as follows:

> Standard breaks, usually there's two, 10 to 15 breaks, and one, 30 to 45 minute, meal break in an eight-hour shift. Most people can produce an average amount, with average quality and maintain employment is they're not off task 15% of the time or more. When a person starts and unskilled job, they will get three to six days; they can be late, absent or leave early. The only way to get any more days than the three to six is to not be late or absent or leave early for an entire month. So, really, if someone was gone or they left early, even one time every single month, they would lose their job in three to six months.

(Tr. 1034).

15

**IV.** **The ALJ's Decision**

1.    The claimant last met the insured status requirements of the Social Security Act on December 31, 2019. The claimant has MQGE insured status through December 31, 2024.

2.    The claimant did not engage in substantial gainful activity during the period from her alleged onset date of November 15, 2019 (20 CFR 404.1571 et seq.).

3.    Through the date last insured, the claimant had the following severe impairments: fibromyalgia; obesity; shortness of breath; and migraines (20 CFR 404.1520(c)).

4.    Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.    After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except: she can occasionally climb ramps and stairs, never climb ladders ropes or scaffolds, and can occasionally stoop, kneel, crouch, and crawl. She can occasionally work in conditions of humidity and wetness, in conditions of extreme heat or cold, or in conditions where there is concentrated dust, odors, fumes, and other pulmonary irritants, or where vibrations are present. She can use foot controls occasionally with the left lower extremity. She can frequently be exposed to concentrated smells of bleach. She can use a walker.

6.    Through the date last insured, the claimant was unable to perform any past relevant work (20 CFR 404.1565).

7.    The claimant was born on February 16, 1975 and was 44 years old, which is defined as a younger individual age 45-49, on the date last insured (20 CFR 404.1563).

8.    The claimant has at least a high school education (20 CFR 404.1564).

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569a).

11. The claimant was not under a disability, as defined in the Social Security Act, at any time from November 15, 2019, the alleged onset date, through December 31, 2019, the date last insured (20 CFR 404.1520(g)).

(Tr. 98-1000).

## V. Law & Analysis

### A. Standard for Disability

Social Security regulations outline a five-step process the ALJ must use to determine whether a claimant is entitled to benefits:

1. whether the claimant is engaged in substantial gainful activity;

2. if not, whether the claimant has a severe impairment or combination of impairments;

3. if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1;

4. if not, whether the claimant can perform their past relevant work in light of his RFC; and

5. if not, whether, based on the claimant's age, education, and work experience, they can perform other work found in the national economy.

20 C.F.R. § 404.1520(a)(4)(i)-(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006). The Commissioner is obligated to produce evidence at Step Five, but the claimant bears the ultimate burden to produce sufficient evidence to prove they are disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a).

### B. Standard of Review

This Court reviews the Commissioner's final decision to determine if it is supported by substantial evidence and whether proper legal standards were applied. 42 U.S.C. § 405(g);

17

*Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). However, the substantial evidence standard is not a high threshold for sufficiency. *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019). "It means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). Even if a preponderance of the evidence supports the claimant's position, the Commissioner's decision cannot be overturned "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence. *Id.* at 476. And "it is not necessary that this court agree with the Commissioner's finding," so long as it meets the substantial evidence standard. *Rogers*, 486 F.3d at 241. This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and that error prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, . . . we review decisions of administrative agencies for harmless error."). Furthermore, this Court will not uphold a decision when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011). Requiring an accurate and logical bridge ensures that a claimant and the reviewing

18

court will understand the ALJ's reasoning, because "[i]f relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked." *Shrader v. Astrue*, No. 11-13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012); *see also Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 749 (6th Cir. 2007).

## VI. Discussion

Cobble raises the following two issues for this Court's review:

1. The ALJ erred by failing to fulfill the requirements of SSR 00-4p before relying upon the vocational testimony within the determination.

2. The ALJ erred in her evaluation of the testimony from the medical expert.

(ECF Doc. 8, p. 13).

### A. Cobble has not demonstrated reversible error regarding the ALJ's failure to ask whether the VE's testimony was consistent with the DOT.

In her first issue, Cobble argues that remand is required because the ALJ failed "to obtain the basis for the vocational expert's testimony at [the] hearing." (*Id.*). According to Cobble, "[w]ithout the ALJ inquiring about the basis of the expert's opinion, judicial review is simply not possible here." (*Id.* at p. 14). In response, the Commissioner argues that Cobble has "waived any challenge to the VE's testimony because she did not raise the issue at the ALJ hearing." (ECF Doc. 10, p. 9). Cobble argues that waiver is inapplicable "because the ALJ never asked the standard question required of SSR 00-4p to assure that the vocational expert's testimony was consistent with" the DOT. (ECF Doc. 8, p. 16).

At the fifth step of the sequential evaluation, ALJs are permitted to consider "'reliable job information' available from various publications" as evidence of the claimant's ability to do other work "that exists in the national economy." SSR 00–4p, 2000 WL 1898704 at *2 (Dec. 4, 2000) citing 20 C.F.R. §§ 404.1566(d) and 416.966(d). The DOT is one such publication, and provides "information about jobs (classified by their exertional and skill requirements) that exist

in the national economy." 20 C.F.R. § 416.969. ALJs are also authorized to consider the testimony of VEs as a source of occupational evidence. S.S.R. 00–4p, 2000 WL 1898704 at *2. *See also Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 603 (6th Cir. 2009).

SSR 00–4p sets forth "the actions required of an ALJ when there is an apparent conflict between the testimony of the vocational expert and the DOT." *Martin v. Comm'r of Soc. Sec.*, 170 Fed. Appx. 369, 374 (6th Cir. 2006). In pertinent part, SSR 00–4p provides:

> [B]efore relying on VE . . . evidence to support a disability determination or decision, our adjudicators must: Identify and obtain a reasonable explanation for any conflicts between the occupational evidence provided by the VEs ... and information in the [DOT], including its companion publication, the Selected Characteristics of Occupations . . . and Explain in the determination or decision how any conflict that has been identified was resolved.

SSR 00–4p, 2000 WL 1898704 at *1 (SSA Dec. 4, 2000).

SSR 00–4p imposes an "affirmative responsibility" on the ALJ to ask about any possible conflicts between the VE testimony and information provided in the DOT. *See* S.S.R. 00–4p, 2000 WL 1898704, at *2, *4; ("[VE testimony] should be consistent with the occupational information supplied by the DOT . . . the adjudicator will inquire, on the record, as to whether or not there is such consistency.").

Accordingly, because of the affirmative duty SSR 00-4p places on the ALJ, I agree with Cobble that she has not waived the argument for this Court's review. However, my inquiry does not end there; an ALJ's failure to inquire into whether the VE's testimony is consistent with the DOT is not subject to remand in the event of harmless error. "[A]n ALJ's failure to inquire about consistency with the DOT may constitute harmless error where there is no conflict between the VE's testimony and the DOT. *Bobo v. Berryhill*, No. 1:16CV2722, 2017 WL 7051997, *20 (N.D. Ohio, Sept. 21, 2017). An ALJ's error under SSR 00-4p is harmless when there is no conflict between the VE's testimony and the DOT. *Joyce v. Comm'r of Soc. Sec.*, 662 F. App'x

430, 436 (6th Cir. 2016) ("[A]n ALJ's failure to inquire about a nonexistent conflict is necessarily harmless[.]"); *Johnson v. Comm'r of Soc. Sec.*, 535 Fed. Appx 498, 508 (6th Cir. 2013); *Bennett v. Comm'r of Soc. Sec.*, No. 1:16-cv-227, 2016 WL 7395795 at * 6 (N.D. Ohio Dec. 2, 2016) ("[U]nless the VE's testimony actually conflicts with the DOT, such error is harmless.") *report and recommendation adopted by* 2016 WL 7396707 (N.D. Ohio Dec. 21, 2016).

Here, Cobble argues that the ALJ's error is harmful because while the VE "opined that the sedentary jobs and numbers she offered would remain unaffected with the additional limitation of use of a walker, in [Cobble's] previous hearing before ALJ Carey the vocational expert stated that the use of a walker is not covered in the DOT and was in fact work preclusive." (ECF Doc. 8, p. 18). However, this assertion does not demonstrate that the testimony elicited at the hearing at issue was inconsistent with the DOT. Theoretically the VE's testimony could have been inconsistent at Cobble's previous hearing. Cobble has not directed this court to any testimony of the VE in the present hearing that directly conflicts with the DOT and therefore has not carried her burden to demonstrate the ALJ's error was reversible. Accordingly, I cannot recommend remand on this basis.

### B. The ALJ properly considered the medical opinion of Dr. Kwock.

In her second issue raised before this Court, Cobble argues that the ALJ erred in her reliance on the medical expert, Dr. Kwock's testimony at the hearing. (ECF Doc. 8, p. 16). Specifically, she argues that Dr. Kwock's testimony was limited to his specialty of orthopedics, and she has severe conditions that are not musculoskeletal. (*Id.*). Further, Cobble asserts that "[a]lthough the ALJ found the expert's opinion that [she] did not require a walker to be

21

persuasive, this testimony can only be viewed in the light that [her] musculoskeletal conditions alone do not support a finding that [she] needed a walker." (*Id.*).

First, I must acknowledge the inconsistency in Cobble's argument. She takes issue with the ALJ's acceptance and persuasiveness finding of Dr. Kwock's testimony that she did not medically need a walker without noting that the ALJ's RFC found that Cobble could use a walker. (Tr. 993). Therefore, as it pertains to Dr. Kwock's testimony regarding her need for a walker, any alleged error would necessarily be harmless. *Rabbers v. Comm'r Social Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) (noting that a case will not be remanded unless the claimant has been prejudiced or deprived of substantial rights).

Next, Cobble claims that the ALJ erred when she found Dr. Kwock's opinion persuasive without explaining why it was ultimately not adopted. (ECF Doc. 8, p. 17). I find that Cobble's argument is misguided.

Before reaching Step Four of the sequential analysis laid out in the regulations, the ALJ determines a claimant's RFC after considering all the medical and other evidence in the record. 20 C.F.R. § 404.1520(e). In doing so, the ALJ is required to "articulate how [she] considered the medical opinions and prior administrative medical findings." 20 C.F.R. § 404.1520c(a). At a minimum, the ALJ must explain how she considered the supportability and consistency of a source's medical opinion(s), but generally is not required to discuss other factors. 20 C.F.R. § 404.1520c(b)(2). According to the regulations, the more consistent a medical opinion is with the evidence from other medical and nonmedical sources, the more persuasive the medical opinion will be. This is the consistency standard. And the regulation specifies that the more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion, the more persuasive the medical opinion will

22

be. This is the supportability standard. *See* 20 C.F.R. § 404.1520c(c)(1)-(2). Consistency concerns the degree to which the opinion reflects the same limitations described in evidence from other sources, whereas supportability concerns the relevancy of objective medical evidence and degree of explanation given by the medical source to support the limitations assessed in the opinion. *See* 20 C.F.R. § 404.1520c(c)(1)-(2).

Although the ALJ is not required to use the 'magic words' of "supportability" and "consistency" when describing their reasoning, the ALJ must still provide sufficient reasoning, scaffolded with references in the medical record to support their decision, for a subsequent reviewer to trace the lines of their reasoning. *Lawrence v. Comm'r of Soc. Sec.*, No. 1:21-CV-01691-JG, 2023 WL 2246704, at *20 (N.D. Ohio Jan. 19, 2023), *report and recommendation adopted*, No. 1:21-CV-01691, 2023 WL 2242796 (N.D. Ohio Feb. 27, 2023) ("Although the ALJ did not use the term supportability or consistency in the above evaluation, the ALJ made findings relative to the opinion related to supportability and consistency."). While the ALJ did not specifically use the term "supportability," I find she has provided sufficient description of her determination to permit my review.

In her opinion, the ALJ found as follows:

John F. Kwock, M.D. an impartial medical expert, testified at the February 2024 hearing. Dr. Kwock is a board-certified orthopedic physician and surgeon with over 35 years of experience. The doctor testified that he reviewed the claimant's file and listened to her testimony. Dr. Kwock stated that the only severe medically determinable physical impairment he found with his review of the evidence is osteoarthritis of the left knee. The doctor said that the evidence did not support a meeting or equaling of any musculoskeletal listing. With that impairment, Dr. Kwock testified that there was no evidence in the record that supported the medical necessity for an assistive device. The doctor did say that obesity could possibly exacerbate pain in the knee to the point where an assistive device could be needed since anything is possible. Dr. Kwock's opinion was persuasive he is an impartial medical expert who reviewed all evidence, and his opinion was consistent with the overall evidence such as imagining studies that found mild degenerative changes in

23

the left knee only and physical exams, like the consultative examination, that found she had full strength in the bilateral lower extremities[.]

(Tr. 994-96) (internal citations omitted).

The ALJ then discussed, in detail, the other medical evidence in the record, including Cobble's diagnostic treatment for her chest pain and shortness of breath which revealed no acute findings or medically determinable causes for her symptoms aside from the possibility of her anxiety. (Tr. 995-96). She noted that Cobble was prescribed a wheeled walker for unsteady gait and weakness following her hospitalization for COVID related pneumonia, and later reported that she was able to walk around her apartment without the use of a walker but needed it outside of the apartment. (*Id.*).

In her decision, the ALJ explicitly states why she found Dr. Kwock's opinion to be consistent with the record. (Tr. 994 ("his opinion was consistent with the overall evidence such as imaging studies that found mild degenerative changes in the left knee only and physical exams, like the consultative examination, that found she had full strength in the bilateral lower extremities.")). Further, while more implicit in nature, the ALJ acknowledged supportability by stating that Dr. Kwock was a board-certified orthopedic physician and surgeon and that after reviewing the file and listening to Cobble's testimony, it was his opinion that "the only severe medically determinable physical impairment . . . is osteoarthritis of the left knee." (*Id.*). Notwithstanding Dr. Kwock's finding, the ALJ found that Cobble had the following severe impairments: fibromyalgia, obesity, shortness of breath, and migraines. (Tr. 989). She found Cobble's degenerative joint disease in her left knee to be non-severe. (*Id.*). The ALJ discussed these impairments in her RFC analysis. (Tr. 995-98). In context, I can discern from the ALJ's decision that she found Dr. Kwock's opinion to be persuasive regarding Cobble's musculoskeletal condition not necessitating the need for a walker. She agreed that the only

24

musculoskeletal impairment was osteoarthritis of the left knee, yet she disagreed with his severity finding, noting that imaging showed mild degenerative changes in the left knee and physical exams demonstrated full strength bilaterally. Although Cobble argues that the ALJ's decision is inconsistent with Dr. Kowck's opinion notwithstanding her finding of persuasiveness, "the regulations make clear that a claimant's RFC is an issue reserved to the Commissioner and the ALJ assesses a claimant's RFC 'based on all of the relevant medical and other evidence of record.'" *Harris v. Comm'r of Soc. Sec.,* No. 1:13-cv-00260, 2014 WL 346287, at *11 (N.D. Ohio, Jan. 30, 2014). Further, while she did not find that Cobble's need for a walker was medically necessary, the ALJ permitted for the use of a walker in the RFC based on the other evidence in the record, including Dr. Kwock's testimony that Cobble's obesity could exacerbate pain in her knee. (Tr. 994, 1027).

Because the ALJ properly described her consideration of Dr. Kwock's opinion according to the regulations, I recommend the District Court affirm.

## II. Recommendation

Because Cobble has not called the Court's attention to any reversible error, I recommend that the Commissioner's final decision denying Cobble's application for DIB be affirmed.

Dated: February 12, 2025

Reuben J. Sheperd
United States Magistrate Judge

25

---

## OBJECTIONS

### Objections, Review, and Appeal

Within 14 days after being served with a copy of this report and recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the magistrate judge. Rule 72(b)(2), Federal Rules of Civil Procedure; *see also* 28 U.S.C.§ 636(b)(1); Local Rule 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.

* * *

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, *2 (W.D. Ky. June 15, 2018) quoting *Howard*. The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).